UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEDERAL TRADE COMMISSION,      )
                               )     No. 10 C 6123
              Plaintiff,       )
                               )
         v.                    )     Judge Ronald Guzman
                               )
AMERICAN TAX RELIEF LLC,       )
et al.,                        )     Magistrate Judge Arlander Keys
                               )
              Defendants.      )

### MEMORANDUM OPINION AND ORDER

On September 24, 2010, the Federal Trade Commission filed
suit in this court, under Section 13(b) of the Federal Trade
Commission Act (FTCA), seeking temporary, preliminary and
permanent injunctive relief, among other forms of relief, against
American Tax Relief, Alexander Seung Hahn (one of ATR's officers,
directors and owners), Joo Hyun Park (Hahn's wife and an officer,
director and owner of ATR) and Park's parents, Young Soon Park
and Il Kon Park.  The FTC alleged that ATR, Hahn and Joo Park
violated Section 5(a) of the FTCA by making false, misleading and
deceptive representations concerning ATR's ability to secure
relief for consumers on their tax debts.  To summarize very
briefly, the FTC alleges that ATR advertises services that
purportedly assist consumers, for a fee, in significantly
reducing their tax liabilities with the Internal Revenue Service
and the various state taxing authorities.  The FTC now concedes

that ATR has successfully reduced some consumers' tax debt, but alleges that the vast majority received absolutely nothing for their money; that, despite its promises, ATR does nothing to relieve the consumers' tax liabilities. The FTC also alleges that Park's parents received funds or other property that can be traced directly to the monies earned from ATR's deceptive and unfair practices.

With its complaint, the FTC filed an *ex parte* motion seeking a temporary restraining order ("TRO"), an asset freeze and the appointment of a receiver. Judge Gottschall, sitting as the emergency judge at the time, granted the FTC's motion; she issued a TRO effective through October 8, 2010, appointed the receiver nominated by the FTC and ordered the defendants to appear before Judge Aspen, the district judge to whom the case was then assigned, on October 7th – the day before the TRO was set to expire. The case was subsequently transferred to Judge Guzman, who entered an order continuing the TRO until October 22nd and setting the matter for a show-cause hearing that same day as to the preliminary injunction question. Judge Guzman then referred the matter to this Court, the parties consented to proceed before a United States Magistrate Judge as to the preliminary injunction question only, and the Court held a hearing on the matter on October 25, 2010. The parties subsequently consented to extend the TRO to November 5, 2010.

In the meantime, the Receiver, Thomas Seaman, assumed full control over ATR on September 27, 2010.  At that time, he also took into possession funds totaling almost $4 million, including $7,600 in cash found in Alex Hahn's office, and a little over $1.6 million from ATR's counsel, which had been held in a client trust account; the remainder came from accounts held by ATR and the individual defendants at Bank of America.[1]  On October 19, 2010, the Receiver filed his First Report, Inventory and Accounting, and ATR has filed objections to the Report.

At the October 25th hearing, neither side presented live witness testimony, but the FTC, ATR and the Receiver all presented arguments, and both the FTC and the ATR submitted volumes of documentary evidence.  After reviewing that evidence, and after hearing from the FTC, the defendants and the Receiver, the Court is persuaded that an injunction should issue.

## Discussion

"Section 13(b) of the [FTCA], 15 U.S.C. §53(b), specifically provides for injunctive relief for consumers harmed by unfair or deceptive acts or practices in or affecting commerce." *FTC v. Datacom Marketing, Inc.*, No. 06 C 2574, 2006 WL 1472644, at *3 (May 24, 2006)(quoting *FTC v. Fin. Res. Unlimited, Inc.*, No. 03 C

---

[1]The United States Attorney's Office for the Central District of California is also investigating ATR.  That office executed a search warrant on ATR's premises in April 2010 and seized company books and records, as well as approximately $8 million.

8864, 2006 WL 1157612, at *11 (N. D. Ill. Apr. 25, 2006)).  In considering the FTC's injunction request, the Court applies the "public interest" test, which requires the Court first to determine whether the FTC is likely to succeed on the merits of its claims and, second, to balance the equities.  *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028-1029 (7th Cir. 1988).  In considering these two factors, the Court "employs a 'sliding scale so that the greater the [FTC's] success on the merits, the less harm [it] must show in relation to the harm [the defendants] will suffer if the preliminary injunction is granted.'" *Datacom*, 2006 WL 1472644, at *3 (quoting *FTC v. Growth Plus International Marketing, Inc.*, No. 00 C 7886, 2001 WL 128139, at *2 (N.D. Ill. Jan. 9, 2001); *Kinney v Local 150*, 994 F.2d 1271, 1277 (7th Cir. 1993)).  "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Datacom*, 2006 WL 1472644, at *3 (quoting *FTC v. Phoenix Avatar, LLC*, No. 04 C 2897, 2004 WL 1746698, at *9 (N.D. Ill. July 30, 2004); *Ty, Inc. v. Jones Group Inc.*, 237 F.3d 891, 896 (7th Cir. 2001)).

Likelihood of Success

In Count I of its complaint, the FTC alleges that ATR "[i]n

4

numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants tax relief services, . . . represented, directly or indirectly, expressly or by implication, that Defendants have significantly reduced the tax debts of thousands of people" when, "[i]n truth and in fact, Defendants have not significantly reduced the tax debts of thousands of people."  Complaint, ¶¶32-33.

In Count II, the FTC alleges that ATR has represented, "directly or indirectly, expressly or by implication, that:

a.   Consumers qualify for a tax relief program, including, but not limited to, an Offer in Compromise or a Penalty Abatement; and

b.   By purchasing Defendant's Services, consumers will be able to obtain a settlement that significantly reduces their total tax debts."

The FTC further alleges that, "[i]n truth and in fact, in numerous instances in which Defendants have made" these representations:

"a.   Consumers do not qualify for a tax relief program, including, but not limited to, an Offer in Compromise or a Penalty Abatement; and

b.   By purchasing Defendants' services, consumers are not able to obtain a settlement that significantly reduces their total tax debts."   Complaint, ¶¶35-36.

Initially, the FTC seemed to be alleging that ATR was a completely fraudulent operation that performed no legitimate work and had helped no consumers.  It seems to have backed off that stance a bit to the point where it now claims that "ATR falsely promised consumers that it could settle their tax debts and save them substantial amount of money, but in the end, ATR only succeeded in taking money from *over 20,500* consumers, while helping *less than 1,000* in total."  FTC's Reply, p. 1 (emphasis in original).  Either way, the FTCA would be violated.  Tangentially, the FTC seems to be alleging that ATR failed to disclose that, even if ATR could obtain some measure of relief, once its exorbitant fees were factored into the mix, most consumers would be worse off financially than they would have been if they had simply paid the IRS what they owed.

The FTC may use two theories to prove that an advertisement is deceptive or misleading: (1) the "falsity" theory and (2) the "reasonable basis" theory.  *FTC v. QT, Inc.*, 448 F. Supp 2d 908, 958-959 (N.D. Ill. 2006) (citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994); *FTC v. Sabal,* 32 F.Supp.2d 1004, 1007 (N.D. Ill. 1998)).  Under the falsity theory, the FTC has the burden of proving that the express or implied claim in the advertisement is false.  *Id.* at 959 (citing *Pantron*, 33 F.3d at 1096).  To prevail on the reasonable basis theory, the FTC must prove that defendants lacked a reasonable basis for asserting

that the claim was true. *Id.* (citing *Pantron,* 33 F.3d at 1096).
Here, the Court is persuaded that the FTC could succeed under
either theory.

As an initial matter, the Court finds that ATR's claim of
helping thousands has been widely disseminated.  The FTC
submitted a transcript of a radio commercial captured from ATR's
website on March 11, 2010; the FTC also played the commercial at
the October 25th hearing. The commercial features Pat Summerall,
the former NFL player and sportscasting personality, who
represents that ATR "has helped thousands of honest, hard-working
Americans settle their tax debt for less than they owe."
Transcript of Recording, Menjivar Dec., Exhibit M, p. 3, lines 8-
10 (attached at PX 1).  In addition, the FTC submitted a
transcript of a television commercial, also captured from ATR's
website on March 11, 2010, which represents that ATR has "helped
thousands of people reduce their tax debt."  Transcript of
Recording, Menjivar Dec., Exhibit N, p. 3, lines 13-14 (attached
at PX 1). ATR does not dispute the authenticity of the
recordings; nor do the defendants dispute that they made the
representations in their advertising materials.

Additionally, the representation that it has helped
"thousands" of consumers appears, in one form or another, in the
letters ATR mails to consumers: some letters state that ATR has
"successfully served thousands of individuals and business

7

nationwide." *See, e.g.*, Menjivar Dec., Exhibits Q, Y; Deweese
Dec., Exhibit A (attached at PX 16); Dillon Dec., Exhibit A
(attached at PX 17); Gaunt Dec., Exhibit A (attached at PX 19);
Kline Dec., Exhibit A (attached at PX 23); Madson Dec., Exhibit B
(attached at PX 24); Monday Dec., Exhibit A (attached at PX 26);
Pickett Dec., Exhibit A (attached at PX 27); Wales Dec., Exhibit
B (attached at PX 31).  Others state that ATR has "successfully
helped thousands of other taxpayers settle their tax debts,
including personal, state, and payroll taxes for businesses."
*See, e.g.*, Menjivar Dec., Exhibit AA; Violante Dec., Exhibit A
(attached at PX 30); Wales Dec., Exhibit A (attached at PX 31);
McKenney Dec., Exhibit E (attached at PX 2).  Another version
states that ATR has "successfully helped thousands of people
settle their tax debts and we can do the same for you."  *See,
e.g.*, Menjivar Dec., Exhibit BB; McKenney Dec., Exhibit F.  The
question is: did ATR help thousands of people? Or was ATR's
advertising deceptive?

    "In order to establish that an act or practice is deceptive,
the FTC must establish that the representations, omissions, or
practices likely would mislead consumers, acting reasonably, to
their detriment."  *FTC v. World Travel Vacation Brokers, Inc.*,
861 F.2d 1020, 1029 (7th Cir. 1988)(citing *Southwest Sunsites,
Inc. v. FTC*, 785 F.2d 1431, 1435 (9th Cir. 1986)).  *See also FTC
v Bay Area Business Council, Inc.*, No. 02 C 5762, 2004 WL 769388,

at *10 (N.D. Ill. Apr. 9, 2004)("A statement or practice is material if it is likely to affect a consumer's decision to buy a product or service."). "[M]isrepresentations of material facts made for the purpose of inducing consumers to purchase services constitute unfair or deceptive acts or practices forbidden by Section 5(a)." *World Travel Vacation Brokers*, 861 F2d at 1029 (citing *FTC v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1291 (D. Minn. 1985); *National Trade Pub. Serv., Inc. v. FTC*, 300 F.2d 790, 792 (8th Cir. 1962)). "To be actionable under section 5, these misrepresentations or practices need not be made with an intent to deceive." *Id.* (citing *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976); *Regina Corp. v. FTC,* 322 F.2d 765, 768 (3d Cir. 1963)).

To support its claim that ATR made material mis-representations in its advertisements and in its dealings with consumers, the FTC has submitted declarations from consumers who were – for all intents and purposes – scammed by ATR; each paid significant fees to ATR, yet received little or nothing in return, and each said they were induced to do so by ATR's promises and guarantees that it could settle tax liabilities for a small percentage of the debt claimed by the IRS. For example, Rickey Dillon, who called ATR in January of 2009 and paid ATR $4,800 to help him settle roughly $30,000 in tax liabilities, stated that he "never would have paid ATR in the first place if

their representative had not made the bold promise that they could reduce my tax debt from $30,000 to only $2,500." Dillon Declaration, ¶16 (attached as PX 17). Warren Mesler, who, in February of 2007, paid ATR $9,000 to help him settle roughly $60,000 in tax liabilities, stated that he "would have never paid that money to ATR in the first place if I had not been misled by ATR's television advertisement and their representatives' false promises that ATR could substantially reduce my tax debt." Mesler Declaration, ¶13 (attached as PX 25). Jacque Pickett, who, in April 2008 paid ATR $5,800 to help him settle over $22,000 in tax liabilities, stated that he "would never have paid ATR the money in the first place if they had not falsely promised to reduce my tax debt." Pickett Declaration, ¶39 (attached as PX 27). Valorie Tobias, who, in 2006, paid ATR $3,800 to help settle over $10,000 in tax liabilities, stated that "[t]he only reason I agreed to pay ATR $3,800 was because, based on the advertisement and my discussion with ATR's representative, I was led to believe that ATR could completely clear my tax debt." Tobias Declaration, ¶5 (attached as PX 29). Based upon these statements, and numerous others in the record to the same effect, the Court is persuaded that the FTC will have no difficulty demonstrating that consumers were induced to pay ATR because of the representations made in ATR's advertisements and because of the promises made by ATR's salespeople.

10

Beyond that, the record contains an abundance of evidence showing that consumers were harmed, not helped, by ATR.  For example, the record includes a declaration from Gary Almond, who has served since 1992 as the Vice President of Operations for the Better Business Bureau covering Los Angeles and other counties in Southern California.  *See* PX 10.  According to Mr. Almond, since 1999, the BBB "has received more than 375 complaints on American Tax Relief . . . from consumers located across the United States."  Almond Dec., ¶9.  Mr. Almond stated that the complaints follow a pattern, with consumers generally reporting that they

> did not receive the services that they were promised.
> Specifically, consumers have complained that they were
> told they qualified for an Offer in Compromise,
> interest or penalty abatements, or that their tax debts
> could be reduced by specific amounts, but those
> promises never materialized.  Other consumers have
> complained that ATR made unauthorized charges or debits
> on their credit cards or bank accounts after the
> company obtained their personal information.

*Id.*

Mr. Almond also stated that the BBB had received complaints as recently as June 17, 2010 and that there were three outstanding complaints on ATR as of that day, June 25, 2010; he stated that the BBB rated ATR with an "F", the lowest rating possible for a company.  Almond Dec., ¶¶11-12.  According to Mr. Almond, after attempting to work with ATR to address consumer complaints, in June 2002, the BBB revoked ATR's BBB membership.  *Id.*, ¶23.  In fact, Mr. Almond stated, in 2005, ATR received one

11

of the BBB's ten "Pluto Awards" – awards given each year to the
companies "that use underhanded business practices and ambiguous
advertising to augment their riches and defraud the American
public of billions of dollars each year." Almond Dec., ¶32.

The record also includes a declaration from Norma Iris
Garcia, who worked for ATR as a "resolution specialist" from July
2004 to December 2004. *See* PX 9. Ms. Garcia stated that, "in
many cases there was very little, if anything, that could be done
to reduce the clients' tax debts, despite what clients had been
led to believe by the bold claims made by ATR's sales people."
Garcia Dec., ¶15 (attached as PX 9). She stated that, in her
experience as an attorney handling tax resolution issues, "most
of [ATR's] clients simply did not qualify for OICs or abatements
with the IRS or other taxing authorities," and that, when she
advised clients that they did not meet the prerequisite criteria
for these types of tax relief, they were shocked because they had
been promised such relief by ATR's sales department. Garcia
Dec., ¶¶16-19.

Ms. Garcia also stated that she was "inundated with
telephone calls on a daily basis from customers who were calling
for updates about their cases and complaining that they did not
receive the services promised to them by ATR's sales people."
Garcia Dec., ¶26. She stated that

> [t]here was a distinct pattern to customers' calls and
> complaints. Most of them said that they had been told

12

they'd qualified for an OIC and some of them said that
they had been told that ATR would be able to get
interest and penalty abatements for them.  They also
said that the sales people had promised them that ATR
could settle their debts so that they wouldn't have to
pay the IRS anywhere close to what they owed.
Consumers also complained that ATR had placed
unauthorized charges on their credit cards or had taken
unauthorized debits from their bank accounts.  Many of
these consumers complained that they had been charged
twice the amount that they had agreed to, and that they
had not authorized these additional charges."

Garcia Dec., ¶26.[2]

Moreover, even if ATR never explicitly guaranteed that it

could obtain OIC's for its clients, to reduce their clients' tax

liability to "pennies on the dollar," that was certainly the

impression created by the advertisements and by the scripts used

by the sales team.  It is clear that the sales team failed to

advise clients that OIC's were relatively uncommon and difficult

to obtain, that the scenario of satisfying one's tax liability

for "pennies on the dollar" was relatively rare, or that, in the

end, clients would likely pay out more than they otherwise would

if they had simply dealt directly with the IRS (even those who

saved money on their tax bill, in the end, paid out more money,

net-net, once ATR's fees were factored into the mix).  Nor were

clients advised of ATR's refund policy (or, more accurately, no-

refund policy).  And, under Section 5(a) of the FTC Act,

omissions of material fact are deceptive. *See World Travel*, 861

---

[2]In the interest of full disclosure, ATR fired Garcia on
December 12, 2004 for coming in late.  Garcia Dec., ¶37.

13

F.2d at 1029. Courts look to the "overall net impression" of
consumers when deciding whether particular statements or
omissions are deceptive. *Kraft,* 970 F.2d at 315. "Deception may
be made by innuendo rather than outright false statements,"
*National Bankers Services, Inc. v. FTC,* 329 F.2d 365, 367 (7th
Cir. 1964); and statements can "create deceptive impression on
purchasers even though they may be technically interpreted as
true or partially true." *L.G. Balfour Co. v. FTC,* 442 F.2d 1, 17
(7th Cir. 1971)). The declarations included in the FTC's
submissions consistently demonstrate that ATR's sales team
created the impression that the promised results – negotiations
which would reduce clients' tax liabilities by significant
percentages, and allow them to settle their debts for "pennies on
the dollar" were all but guaranteed. The consumers consistently
stated that they did not know about ATR's refund policy, and
didn't really care, given the guarantees they received.

The parties have dedicated a fair amount of energy to the
question of whether consumers would actually qualify for Offers
in Compromise, as promised by ATR. Initially, the FTC seemed to
be alleging that every potential client who called ATR was told
that he or she qualified for an Offer in Compromise, which would
allow the consumer to settle their tax liability for a fraction
of what they owed. The FTC has backed off that claim to some
extent – and wisely so, as the FTC's evidence confirms that this

14

was simply not the case.  Indeed, when the FTC's investigator,
Roberto Menjivar, called ATR posing as a prospective client, he
was told by ATR that he did not "fit the criteria" for an OIC and
ATR's representative explained exactly why he did not fit the
criteria.  *See* Menjivar Dec., Exhibit P, pp. 42-44.  On this
point, ATR's representative was unequivocal: he said "quite
frankly, let me just tell it to you bluntly, you don't qualify
for that.  If you did, we would get you that."  Menjivar Dec.,
Exhibit P, p. 44.

Nevertheless, it does appear that an extraordinarily high
number of consumers were told that they qualified for Offers in
Compromise.  To support its claim that these representations were
false and made solely to induce consumers to sign on as clients,
the FTC has offered declarations from Norma Iris Garcia, an
attorney who worked for ATR as a "resolution specialist" from
July 2004 to December 2004, and from Jeremy Bachtle, who worked
as a sales representative for ATR from April 2002 to February
2003.  *See* Garcia Dec. (attached at PX 9); Bachtle Dec. (attached
at PX 35).  Mr. Bachtle stated that "[b]ased on my experience at
ATR, every caller who contacted ATR 'qualified' for a tax relief
program, either an Offer in Compromise ("OIC") or Penalty
Abatement, even when it was clear that they would not qualify
under IRS standard."  Bachtle Dec., ¶8.  He stated that the
scripts ATR provided to its salespeople, which he was required to

memorize, dictated what ATR's sales representatives were to tell prospective clients. *Id.* Ms. Garcia stated that, in her experience as an attorney handling tax resolution issues, "most of [ATR's] clients simply did not qualify for OICs or abatements with the IRS or other taxing authorities," and that, when she advised clients that they did not meet the prerequisite criteria for these types of tax relief, they were shocked because they had been promised such relief by ATR's sales department. Garcia Dec., ¶¶16-19. Ms. Garcia stated that, "in many cases there was very little, if anything, that could be done to reduce the clients' tax debts, despite what clients had been led to believe by the bold claims made by ATR's sales people." Garcia Dec., ¶15. Declarations from two other former employees[3] are consistent: Julissa Barton, who worked as an administrative assistant at ATR from April to July of 2009, stated that "[f]rom what [she] overheard, ATR only told people they qualified for either Offers in Compromise or Penalty Abatements" and that she did not remember ever hearing an ATR sales representative tell a prospective client that they did not qualify." Barton Dec., ¶11 (attached at PX 7). And Shannon Byrd, an attorney who worked as

---

[3] Again, in the interest of full disclosure, Ms. Barton's declaration makes clear that she was fired by ATR and that, despite her relatively short stint at ATR, she clearly did not have a good relationship with Alex Hahn. And Ms. Byrd, who worked for ATR for just four months, quit not because of any suspected wrongdoing, but because she felt that the resolution department was understaffed and that she was overworked.

a tax resolution specialist at ATR from September to December of 2009, stated that, throughout her employment, she received daily calls from clients who had been misled by ATR's sales people; she stated that "[a]lmost every client I spoke with told me that they had been promised that ATR could substantially reduce their tax debts through Offers in Compromise ("OICs") or interest or penalty abatements with the IRS," yet, "[t]he vast majority of ATR's clients whose files I worked on did not qualify for OICs or interest or penalty abatements." Byrd Dec., ¶¶20, 23.

In addition, the FTC has submitted a declaration from Arthur "Kip" Dellinger, Jr., a tax expert, who stated that "[f]ew taxpayers qualify for OICs . . . because of the strict eligibility requirements that must be met" and that there are "no tricks or secret strategies" that can be used to help a taxpayer qualify for an OIC; under the IRS's guidelines, a taxpayer either qualifies or does not qualify. Dellinger Dec., ¶14 (attached at PX 6).

In response to all of this, ATR submitted three binders of documents, most of which are letters and other documentation from the IRS confirming that some form of tax relief was obtained for a taxpayer who was presumably working with ATR. The Court has carefully reviewed these documents, page by page. And, although there are a lot of documents included, they evidence just 186 Offers in Compromise and just 154 penalty abatements.

ATR also submitted declarations from six consumers who were "very satisfied with ATR's services and would recommend them to anyone who had an IRS tax problem"; in each case, the IRS accepted an OIC from the taxpayer that was substantially less than the amount the IRS had been "attempting to collect." *See* Bateman Declaration, ¶¶2,4; McCall Declaration, ¶¶2,4; Sanchez Declaration, ¶¶2,4; Shoham Declaration, ¶¶2,4; Tunnell Declaration, ¶¶2,4; Warda Declaration (all included at DX 5). All but one of these consumers is included in the other documents produced by ATR, which leaves ATR's tally at 341 – not even close to the "thousands" claimed.

ATR has suggested that its efforts to produce documentation evidencing its successes are hampered by the fact that the United States Attorney's Office seized many of ATR's documents. But, if this were really a factor, one might expect that the documents ATR had at present would all post-date that seizure, which occurred in April of 2010. But that is not the case; the documents ATR produced date from 2006, 2007, 2008, 2009 and 2010.

In addition to the IRS documents and the declarations just discussed, ATR submitted some employee declarations of its own. First, ATR has submitted the declaration of Stacey Brandon, an attorney who worked in ATR's tax resolution department from November 2005 until the Receiver arrived on September 24, 2010 – and, in fact, it appears that she is still on the job, though she

now reports to the Receiver.  Ms. Brandon stated that, during her tenure, she has serviced "numerous" customers who were "extremely pleased" with the results ATR was able to achieve for them. Brandon Dec., ¶6 (attached at DX 2).  Ms. Brandon also does a thorough job of defending four cases in which ATR's representatives told fictitious consumers (FTC operatives posing as potential clients) that they would qualify for an OIC.

ATR also submitted a declaration from Patricia Barraza, who worked as Mr. Hahn's executive assistant from January 2006 until September 24, 2010, when the Receiver arrived.  According to Ms. Barraza, "[a]s of September 24, 2010, ATR had several thousand pending cases for clients who had submitted payment and were in the process of being serviced by ATR, many of whom were simply awaiting relief to be granted by the IRS."  Barraza Dec., ¶21 (attached as DX 4).  But, like Ms. Brandon, Ms. Barraza does not say – let alone substantiate – that ATR has helped thousands of consumers.  Nor does she say anything about how many clients were told they qualified for OICs, how many clients actually qualified for OICs, etc.

Moreover, even if there were doubt as to whether the FTC will be able to prove that ATR's claims were false, there is no doubt that the FTC will be able to show that ATR's claims were not substantiated.  And, if an advertiser lacks a reasonable basis for its claims, that may be enough to show a violation of

19

the FTCA.  *See FTC v. US Sales Corp.*, 785 F.Supp. 737, (N.D. Ill.
1992)(citing *Thompson Medical Co., Inc. v. FTC*, 791 F.2d 189, 193
(D.C. Cir. 1986)(advertisement considered deceptive if advertiser
lacks a "reasonable basis" to support the claims made in it);
*Sears, Roebuck and Co. v. F.T.C.*, 676 F.2d 385 (9th Cir.1982)).
From what the Court has seen so far, ATR might be able to show
that it has *had* thousands of clients, but it certainly cannot
show that it has *helped* that many people.  In fact, the evidence
does not even come close to substantiating this claim.  The
evidence on this point consists solely of Stacey Brandon's
statement that she serviced "numerous" customers who were
extremely pleased with the results ATR achieved for them, *see*
Brandon Dec., ¶6, and the documentation evidencing 187 Offers in
Compromise and 154 penalty abatements.  "Numerous" plus 341 does
not equal "thousands."

At the end of the day, the ultimate trier of fact in this
case may determine that Ms. Brandon is more credible than Mr.
Dellinger and the other declarants offered by the FTC.  But, for
present purposes, the issue is not simply whether the clients
would in fact have qualified for OICs.  In many cases described
in the record, the issue is that, regardless of the client's
eligibility, ATR did nothing to help many of its clients (even
after they paid ATR's fees) to obtain the tax relief ATR
promised.  Ms. Brandon's declaration says nothing about that

issue.

One final issue bears mentioning on the likelihood of success factor: in its attempts to persuade the Court, the FTC characterizes Mr. Hahn as "a convicted felon."  FTC Reply, p. 4. And, in fact, the FTC submitted copies of a 2002 indictment and a 2003 plea agreement in *United States v. Edward Seung Chun, aka Derrick Leigh, aka Alex Hahn, aka Alexader Seung Hahn*, No. SA CR 02-291-AHS (C.D Cal.), in which Mr. Hahn pled guilty to two counts charging violations of 18 U.S.C. §1341, in connection with his operation of, and participation in, a fraudulent telemarketing scheme.  *See* PX 11 (indictment) and PX 12 (Plea Agreement).  In October 2006, the presiding judge in that case sentenced Mr. Hahn to five years probation and ordered him to pay restitution in the amount of $1,283,568.  *See* Judgment and Probation/Commitment Order in *United States v. Hahn*, No. SA CR02-0291-AHS (attached as PX 13).  It is clear from the Judgment and Commitment Order that the sentencing judge knew about Mr. Hahn's involvement with America Tax Relief, yet said nothing negative about it; nor did the judge prohibit him from continuing his involvement with ATR.  *See* PX 13.  Additionally, although the FTC wants the Court to assume that, because Mr. Hahn operated a fraudulent scheme in 2002, he is operating a fraudulent company today, it is equally plausible that someone on probation - and it appears that Mr. Hahn is still on probation - would take greater

care to keep his nose clean during that period.  In short, the
Court has drawn no conclusions from, and made no assumptions
based upon, Mr. Hahn's past conduct; this information simply did
not factor into the Court's analysis today.


The Balance of Harms

     As explained, when the Court considers the balance of harms,
it does so, not by itself, but in connection with the evidence on
the likelihood of success; the greater the likelihood that the
FTC will succeed on the merits of its claims, the less harm it
must show in relation to the harm ATR will suffer if the
preliminary injunction is granted.  *E.g.*, *Datacom*, 2006 WL
1472644, at *3.  Given that the FTC has demonstrated a strong
likelihood that it will be able to prove its claims, its burden
on this factor is diminished to some extent.

     The FTC makes a couple of arguments concerning the balance
of harms.  First, the FTC argues that consumers have been harmed
by being lied to about their eligibility for tax relief services.
And based upon the limited record before the Court, as outlined
above, there appear to be many consumers who have paid
significant amounts of money to ATR for tax relief services that
they either never obtained or obtained despite, or without any
assistance from, ATR.  That harm is very real, and the evidence
substantiating this claim is unrebutted.  That ATR may have

                              22

helped some consumers does nothing to diminish the harm suffered
by the consumers who paid for services they never received.  The
Court is persuaded that injunctive relief is necessary to prevent
further harm; certainly, the presence of the Receiver should go a
long way toward ensuring that no further harm is done, and the
Court, therefore, rejects ATR's request to remove him.

Additionally, in Count III of its complaint, the FTC alleges
that ATR has, in numerous instances, caused consumers' bank
accounts to be debited, or consumers' credit cards to be charged,
without first obtaining consumers' express informed consent" for
those debits or charges.  Complaint, ¶38.  And the FTC has
offered evidence, in the form of declarations from consumers,
demonstrating that, in some cases, ATR did make unauthorized
charges to consumers' accounts.  In rebuttal, ATR has argued that
the charges described were authorized, but that the consumers
later changed their minds.  There is no evidence to support this
argument.

The FTC also alleges that, even in some cases where ATR
"helped" consumers by getting a penalty abatement, after paying
ATR's fees, those consumers were actually net-net worse off
because the money saved in IRS penalties was actually less than
the fees charged by ATR.  By way of example, a declaration from
one of the FTC's paralegals cites conversations the FTC had with
eight customers who either were not helped at all by ATR, or who

were helped in the sense that they obtained some form of a
penalty abatement, but paid out fees to ATR in an amount that
exceeded any penalty abatement they obtained.  *See* Declaration of
Naomi Eskin, ¶¶3A-3H (attached as PX 34).  All eight customers
described in the exhibit stated that they regretted hiring ATR.
*Id.*

Along the same lines, Attorney Garcia, a former ATR employee
whose declaration is discussed in greater detail above, stated
that she received complaints from consumers who claimed that ATR
"had placed unauthorized charges on their credit cards or had
taken unauthorized debits from their bank accounts.  Many of
these consumers complained that they had been charged twice the
amount that they had agreed to, and that they had not authorized
these additional charges."  Garcia Dec., ¶26.

The FTC also submitted declarations from a number of
consumers (17) who all paid ATR large sums of money (the bulk of
them within the last two years) and yet received virtually
nothing in return.  Most of these consumers state in their
declarations that they were treated shabbily by ATR and its
representatives; most allege that ATR's representatives lied
and/or became unprofessional and even abusive when confronted
with their failure to deliver on their promised tax relief
services.  And most, if not all, say that they never would have
engaged ATR or paid them money if ATR had not guaranteed or

24

promised such amazing results.

Frankly, given the nature of these transactions, the Court initially viewed the consumers' statements with some skepticism. After all, is it really reasonable to believe that one can escape tax liability by paying "pennies on the dollar?" In hindsight, surely even these consumers must realize how foolish they were to believe ATR's promises and to fall for ATR's pushy sales tactics.

But the Court need not rely solely on the consumer declarations. The record contains a letter, written on American Tax Relief letterhead, to J. Salazar at the Public Inquiry Unit in Sacramento, California; the letter states that it is written in response to a complaint filed by Timothy Fullerton, but goes on to launch a personal attack on Mr. Fullerton – an ATR client – that is totally unprofessional and abusive.  *See* PX18 (exhibit C).  This letter gives credence to the consumer reports of behavior that went well beyond obnoxious, pushy salesmanship, that crossed the line into intimidation and abuse.  Quite simply, no legitimate, professional operation would engage in this type of behavior.  This letter - especially when combined with the other declarations reporting similar conduct – is strong evidence that ATR was engaging in the conduct alleged by the FTC – that it scammed consumers out of thousands of dollars each and then, when confronted, blamed the consumers for their inability to follow through on the promised and guaranteed tax relief.  The Court is

persuaded that, absent the relief sought by the FTC, the risk of harm to consumers remains a very real concern.

On the other hand, there is no evidence that consumers – or anyone other than Mr. Hahn, Ms. Park and her parents, whose assets have been frozen – will suffer harm if the injunction is entered.  At the October 25th hearing, Mr. Kreindler represented that the Receiver had essentially rehired the employees he had fired and that he was continuing to operate the business, and that he would "have no issue" on the prohibited acts spelled out in the TRO.  Transcript of October 25, 2010 Hearing, p. 25.  To be sure, Mr. Hahn and Ms Park are harmed because the bulk of their assets have been frozen.  But, on balance, the Court is persuaded that the FTC has met its burden here.  Given that the FTC has demonstrated that it will likely be able to succeed in proving that ATR's advertisements were deceptive, and given the evidence in the record concerning consumers who were scammed out of thousands of dollars each, the Court finds that, on balance, the "harm" factor weighs in favor of entering the injunction. This is not the final step in the process; it is just the beginning.  And – especially with the Court's ruling below concerning the asset freeze – ATR will have its day in court.


The Receiver and the Asset Freeze

As explained above, the Receiver assumed full control over

ATR on September 27, 2010.  At that time, Mr. Seaman took into
his possession funds totaling almost $4 million, including a
little over $1.6 million from ATR's counsel, which had been held
in a client trust account.  Although the Court finds that the
Receiver's continued installation at ATR is necessary to avoid
further harm to consumers, the Court agrees with some of the
objections lodged by ATR.  In particular, after reviewing the
Declaration of Jean Nelson, an attorney who was retained April 9,
2010 to represent ATR's employees in connection with the criminal
investigation, the Court agrees with ATR that the Receiver
appears to have gone into even the nomination process with his
mind made up that ATR was a fraudulent enterprise, and that he
treated ATR's employees in a manner consistent with that belief.
This is particularly apparent in the way he treated employees who
exercised their Fifth Amendment rights and the way he treated Ms.
Nelson when she attempted to protect those rights.  Based upon
Ms. Nelson's declaration, it appears that Mr. Seaman was less
than professional in some of his dealings with the employees and
in his dealings with counsel.

Additionally, his decision to seize funds held by Shepherd
Mullin Richter & Hampton in a client trust account was a bit
heavy-handed.  In his report, Mr. Seaman characterized these
funds as "ATR's former counsel's returned retainer."  *See* Report,
p. 4.  But, at the October 25th hearing, Mr. Kreindler – who

appeared on behalf of ATR - represented that the funds were held by his firm, and that he had turned them over to the Receiver because the Receiver ordered him to do so. That money, sitting as it was in the law firm's account (the account of counsel, not former counsel), was in no danger of being misappropriated or mishandled. What's more, despite the Court's decision today, this case is not as cut-and-dried as it seemed at the time the FTC moved, *ex parte*, for the TRO, and there do indeed appear to be legitimate issues to be pursued in depth as this case makes its way toward a more permanent resolution. To ensure a level playing field throughout the next phase of this case, the Court deems it only fair that those funds be returned to counsel for use in the defense of this case. Defendants are entitled to counsel of their choosing. It would be unreasonable to require counsel to continue to represent Defendants without some assurances that he will be compensated for his services. The Court rejects ATR's request with respect to the remainder of the assets seized or frozen by the Receiver, though having been suitably chastised here, the Court expects the Receiver to respect matters of privilege.

<u>Conclusion</u>

As more fully explained above, the Court finds that the FTC has met its burden of proving that it will likely succeed on the merits of its claims, and that the balance of harms weighs in

favor of granting the requested relief. Accordingly, the Court grants the FTC's motion for preliminary injunctive relief and will enter a preliminary injunction order along the lines of that proposed by the FTC, with some revisions. In this regard, the Court has reviewed the Proposed Preliminary Injunction submitted by the FTC and finds that, assuming that ATR has complied with the terms of the TRO, and the Receiver has taken the actions authorized therein , some of the proposed preliminary injunction language would be unnecessary. Counsel for the parties are directed to confer immediately in an attempt to streamline the preliminary injunction order to be entered in this case, consistent with this Opinion and Order.

Date: November 4, 2010

ENTER:

_Arlander Keys_

ARLANDER KEYS

United States Magistrate Judge